OPINION OF THE COURT
Guy P. De Phillips, J.
On April 21, 1998, petitioner L. G., the father of the then 12-year-old respondent Jennifer G., filed a petition under article 7 of the Family Court Act seeking to have her adjudged a person in need of supervision (PINS). Upon respondent’s return on a warrant and joinder of issue, she was remanded to the custody of the Commissioner of Social Services. Respondent continually absconded from the custody of the Commissioner in violation of the court’s remand orders over a period commencing April 22, 1998 and ending May 5, 1999, during which an additional nine warrants were issued for her arrest. In view of her recalcitrance, Corporation Counsel filed a Family Court Act article 3 juvenile delinquency petition on April 30, 1999, alleging an act which if committed by an adult would constitute criminal contempt in the second degree (Penal Law § 215.50 [3]) in that respondent engaged in intentional disobedience to lawful process or other mandate of a court. On May 5, 1999, upon respondent’s return on the 10th warrant, she was for the first time remanded to secure detention on the delinquency petition as the preventive detention option in the PINS proceeding does not permit a secure facility to be utilized.
An article 3 juvenile delinquency proceeding permits preventive detention in a secure facility for juveniles where there is a substantial probability that the respondent over 10 years of age will not appear on the adjourned date (Family Ct Act § 304.1 [2], [3]; § 320.5 [3]; see, Bogacz, New York Juvenile De *280 linquency Practice § 1-17 [a], [a] [1]; [a] [1] [i], at 96-100 [Lexis Law Publ 1998]). Preventive detention in a secure facility under Family Court Act article 7 involving the very same circumstances of substantial probability that the respondent will not appear on the adjourned date, that is, will abscond or continue to abscond, is specifically proscribed by the State Legislature (Family Ct Act § 720 [2]).
On May 10, 1999, respondent made an admission in the delinquency proceeding and the court conjointly found respondent to be a person in need of supervision in the PINS proceeding.
Family Court Act § 720 (2) provides: “The detention of a child in a secure detention facility shall not be directed under any of the provisions of this article.” This legislative policy is grounded on pecuniary considerations. “According to the legislative memoranda accompanying the enactment of this section, the purpose of this section is to insure continued federal funding to the state under the provisions of the Juvenile Justice and Delinquency Prevention Act of 1974, 42 U.S.C.A § 5601 et seq., which require that all alleged or adjudicated PINS be phased out of secure detention facilities by 1980.” (1980 Opns Atty Gen 33, 34.)
Both article 3 and article 7 are status offenses, the former being criminal and the latter being noncriminal in origin. The dispositional alternatives and the finding of delinquency are imposed in article 3 not because of the underlying act by the respondent which if committed by an adult is a crime, but because the respondent is a person in need of supervision. This commonsense observation is further delineated and explained in the body of this decision and is buttressed by historical study of the Family Court Act and the predecessor courts from which the subject matter jurisdiction of Family Court is derived.[2] Of course it must also be recognized that for purposes of labeling, offenses of a noncriminal nature by a juvenile are referred to as status offenses. The semantical use of this term in the legal *281 and social dialogue in New York appears to have diluted awareness and appreciation of the needs of the PINS child and the crisis posed by the court’s inability to meet those needs when the PINS child flouts lawful orders of the court. “Status” is defined in common parlance “as a. state or condition of a person, b. Position of affairs” (Webster’s New Collegiate Dictionary [2d ed 1953]).
The 1962 Family Court Act, establishing Family Court, combined delinquency and PINS proceedings in one article (then art 7) although the Act split status offenses between delinquency and PINS. (Family Ct Act, as enacted by L 1962, ch 686, eff Sept. 1, 1962.) The predecessor Act defined delinquency as including, inter alla, a juvenile “who is incorrigible, ungovernable or habitually disobedient and beyond the control of [his] parents” (Children’s Ct Act § 2 [a], as enacted by L 1922, ch 547). The 1962 Family Court Act continued this combined jurisprudential and sociological concept in article 7 which stated: “[t]he purpose of this article is to provide a due process of law * * * for considering a claim that a person is a juvenile delinquent or a person in need of supervision” and “devising an appropriate order of disposition” (Family Ct Act § 711, as enacted by L 1962, ch 686). In 1976, this purpose section was amended by a provision of the Juvenile Justice Reform Act to reflect that “[i]n any juvenile delinquency proceeding under this article, the court shall consider the needs and best interests of the respondent as well as the need for protection of the community” (Family Ct Act § 711, as amended by L 1976, ch 878). In no sense may the revision be viewed as diluting the purpose of the juvenile justice system dating from 1824 to the present, mainly that an appropriate dispositional determination whether in a delinquency proceeding or a person in need of supervision proceeding must reflect the needs and the best interest of the respondent. (See, Besharov and Sobie, Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 301.1, at 16.)
In 1973, the Court of Appeals aptly recognized that then Family Court Act article 7 (L 1962, ch 686) represented enlightened legislative recognition of the distinction between a finding of juvenile delinquency and a determination of a need for supervision and that respondents found to be in need of supervision should not be placed in institutions in which juvenile delinquents are confined (Matter of Ellery C., 32 NY2d 588 [1973]). The judicial branch of government, however, did not abandon its responsibility to meet the best interest and needs *282 of children adjudicated to be in need of supervision where such interest and need mandated confinement. As unequivocally stated by Chief Judge Fuld: “The conclusion is clear. Proper facilities must be made available to provide adequate supervision and treatment for children found to be persons in need of supervision.” (Matter of Ellery C., supra, at 591 [emphasis supplied].) The common sense and sound jurisprudential analysis pronounced in Ellery C. is further amplified in Matter of Lavette M. (35 NY2d 136 [1974]). In a cogent opinion by Judge Jasen, the Court declared: “The main thrust of our holding in Ellery C. was that it is inconsistent with the statutory right to ‘supervision’ and ‘treatment’ to place PINS children in institutions in which juvenile delinquents are confined. (32 N Y 2d, at p. 591.) We said it is the confinement of PINS children in a prison atmosphere along with juveniles convicted of committing criminal acts that is proscribed, and not the fact alone of placement in a training school. Put another way, it is the adequacy of the supervision and treatment there provided, not the characterization of the facility as a training school, that is determinative.” (Matter of Lavette M., 35 NY2d 136, 141 [1974] [emphasis supplied].) Both the supervision and the treatment must be adequate to meet the best interests and the needs of the respondent. Inadequacy of one will necessarily undermine the adequacy of the other. This is the salient judicial teaching of the Court of Appeals. However, in an empirical sense, priority must be accorded the criterion of supervision. Treatment, of necessity, implies some form of supervision. The article 7 proceeding is entitled Person in Need of Supervision, not Person In Need of Treatment. Supervision is defined as the “Act of supervising.” (Webster’s New Collegiate Dictionary [2d ed].) Accordingly, one in need of supervision is one who needs oversight for direction.
Pursuant to legislative amendment, since July 1, 1983, article 7 has governed only PINS proceedings (L 1982, ch 920, § 3). Delinquency proceedings since such time have been governed by article 3 (L 1982, ch 920, § 1). From 1983 to 1987 respondents in an article 3 delinquency proceeding or an article 7 PINS proceeding, 10 years of age or older, could be detained in a secure facility, if warranted. However, in 1978 and 1987 the New York State Legislature removed this protection of family life from PINS proceedings for pecuniary reasons as disclosed in the legislative history of Family Court Act § 720 (2) (3) as amended by Laws of 1987 (ch 419, § 18) and Laws of 1978 (ch 548, § 1). These amendments have, in effect, rendered *283 the efficacy of article 7 illusory. A respondent in an article 7 proceeding who has a history of absconding from home already has rebelled against and shown disrespect for parental authority. Common sense and right reason dictate that the fractured parental authority should be supported by the court’s authority as the third branch of government. Instead the respondent with a history of absconding from home soon perceives that the court in enforcing its authority, which in a real sense is another form of parental authority, is incapable of enforcing its authority. The history of this instant PINS proceeding is a classic example of this charade. The absconding respondent in the PINS proceeding is remanded to the Commissioner of Social Services as a form of preventive detention. Since all remands in PINS proceedings must be nonsecure, the absconding respondent is free to abscond and does abscond with impunity as far as an article 7 jurisprudence is concerned.[3] Despite repeated and innumerable violations of the court’s remand orders in a PINS proceeding, the court cannot hold the respondent in a secure facility. The lesson taught the respondent is that the law may be disobeyed and evaded without legal consequence as long as the respondent is charged only with PINS conduct.
Although concerned with the constitutionality of preventive detention, secure or otherwise under article 3 — juvenile delinquency, the United States Supreme Court made the following observations which are equally applicable to PINS children: “The juvenile’s countervailing interest in freedom from institutional restraints, even for the brief time involved here, is undoubtedly substantial as well. See In re Gault, [387 US], at 27. But that interest must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody. Lehman v. Lycoming County Children’s Services, 458 U. S. 502, 510-511 (1982); In re Gault, supra, at 17. Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as parens patriae. See State v. Gleason, 404 A. 2d *284 573, 580 (Me. 1979); People ex rel. Wayburn v. Schupf, [39 NY2d], at 690, 350 N. E. 2d, at 910; Baker v. Smith, 477 S. W. 2d 149, 150-151 (Ky. App. 1971). In this respect, the juvenile’s liberty interest may, in appropriate circumstances, be subordinated to the State’s ‘parens patriae interest in preserving and promoting the welfare of the child.’ Santosky v. Kramer, [455 US 745], 766 (1982).” (Schall v Martin, 467 US 253, 265 [1984].) Of course, critical to reasoned imposition of preventive detention for juveniles under article 7 or article 3 is that it be nonpunitive in purpose.
The inability of the Family Court to enforce its remand or dispositional order of placement in a PINS proceeding due to the abrogation of secure detention as a preventive remedy, where appropriate and warranted, has reduced article 7 to a proceeding of form over substance. Appropriate treatment is inextricably intertwined with adequate supervision. The inability of Family Court to maintain and enforce that supervision by remand or the threat of remand to a secure PINS facility when warranted and for nonpunitive purposes, is a serious jurisprudential and sociological flaw in implementing the public policy concerns envisioned in the creation of Family Court and the enactment of PINS jurisdiction.
If it is posited that a PINS child is needy and has a right to treatment to meet those needs, and if it is posited that society through its courts may exercise parens patriae controls to implement such treatment, then common sense, human nature, life experience and sound jurisprudential teaching instructs that the power to insure necessary supervision to the PINS child is essential.
“Ironically, the term ‘person in need of supervision’ and its impersonal acronym, ‘PINS,’ which was intended to avoid the stigma of the term ‘juvenile delinquent,’ which was in turn intended to avoid the stigma of criminal court terminology, has itself become a term of disrepute and opprobrium, underscoring the apparent unavoidability of stigmatization whenever a label is applied to individuals. [See generally Office of Children’s Services, N.Y. Judicial Conference, Juvenile Injustice (1973).]
“The truth of the matter is that there are no clear dividing lines between delinquent and PINS children. Their truancy rates are equally and extremely high. (Juvenile Injustice, supra, at 17.) PINS children frequently commit criminal acts which either do or do not come to the attention of the authorities. They both often have a long history of contacts with the court and social agencies. According to one study, nearly half of them *285 have experimented with drugs. [Office of Children’s Services, N.Y.S. Judicial Conference, The PINS Child: A Plethora of Problems 75 (1973).] Both delinquent and PINS children often come from similar, one-parent, multi-problem families with a history of poverty and strong evidence of neglectful or at least rejecting parents. (Juvenile Injustice, supra, at 23-25.) In fact, juvenile justice professionals see some categories of PINS children as more disturbed and more difficult to treat than all but the most severe delinquents.” (Besharov, Introductory Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act art 7, at 5.)
The inanity of weakening the concept and efficacy of supervision for PINS children by depriving the court of the power to remand to an appropriate secure setting when necessary to accomplish the rehabilitative and nonpunitive policy underlying PINS proceedings is reflected in the statements attributed to a respondent in a PINS proceeding (Fam Ct, Queens County, index No. S3531/99). That respondent, A.T., was paroled to an alternative educational setting (Alternative To Detention [ATD]). He was suspended for being disruptive, interfering in the learning process, challenging the teacher’s authority and refusing to follow directives. When confronted by the probation officer about his behavior, A.T. stated: “I don’t give a shit about this. I’m here for a PINS. They can’t do shit to me * * * I don’t care about what you have to say. All you need to do is send me home * * * fuck this * * * just give me my shit, I’m out of here.” When the probation officer advised respondent that his statements would be conveyed to the court, respondent is alleged to have replied: “I don’t give a shit, they can’t do anything to me. I’m a PINS * * * I just told you to give me my shit. I’m out of here.”
In salutation to the legislative will, respondent is right. As a PINS, the court and through the court, his parents, his family, society, the State, cannot do anything to him and therefore cannot do anything for him. To state the obvious, this is ludicrous. The undermining of the ability to mandate compliance by respondent when appropriate in PINS litigation teaches the respondent the wrong lesson, to wit, the law, justice, is ineffectual and may be viewed with contempt, derision, and mockery. This same respondent if subsequently brought before the Family Court as an alleged delinquent is then taught that secure detention is an option. How does society through its juvenile court, Family Court, respond to the respondent’s acute question: If you could not detain me in a secure setting to meet *286 my needs as a PINS and I accepted your invitation to treat authority (supervision) with disdain, why do you now hold me accountable for the lesson you taught and compel such supervision in a secure setting to meet my needs as a delinquent?! Apart from sophistry, there is no response, only an acknowledgment — that for monetary consideration alone, New York through its legislative branch abandoned PINS children to their self-will even if self-destructive and paid obeisance to a pejorative social concept that a status offense, PINS, never under any circumstances whatsoever, no matter how inimical or dangerous for the child, warrants secure detention. If the State were called to task by way of analogy in a child protective proceeding for this act, it must be deemed an act of improper supervision and therefore neglect (see, Family Ct Act § 1012).
The statue of the Lady of Justice in Western tradition depicts a goddess wearing a blindfold, holding up in her left hand the scales of justice and in her right hand a sword. Tradition proclaims her as Themis, one of the pre-Hellenic Titans who remained and advised Zeus after his purge of the old pantheon. In Roman times she was called Justitia and has echoes in Egyptian mythology as Maat, the daughter of the sun god, Ra. This sword is a symbol of power as judicial or legal authority distinct from military power (see, definition of “sword” in Webster’s New Collegiate Dictionary [2d ed 1953]). In depriving society through its Family Court of the power to utilize secure detention when appropriate to protect and advance the welfare and to meet the needs of the PINS child, the Legislature, insofar as PINS children are concerned, has amputated the right hand of the Lady of Justice. The hand may be reattached, the power restored, the symbol made whole, but only with an enlightened Legislature and executive well attuned to the value of a child’s life and future.
The court notes that a compelling argument may be urged that the removal of the court’s power to protect PINS children by remand to secure detention, when appropriate and warranted, has deprived such needy children of the equal protection of the laws. The Fourteenth Amendment to the Federal Constitution provides that no State shall “deny to any person within its jurisdiction the equal protection of the laws” (US Const, 14th Amend, § 1). The Constitution of the State of New York similarly declares: “No person shall be denied the equal protection of the laws of this state or any subdivision thereof.” (NY Const, art I, § 11.) “[I]t is clear that though the protection *287 afforded by the equal protection clause is not absolute and does not bar a proper exercise of the State’s police power, it includes protection against legislative action which is palpably arbitrary or unduly discriminatory. It is also clear that the essence of the right to equal protection of the laws is that all persons similarly situated be treated alike” (20 NY Jur 2d, Constitutional Law, § 347). It is not merely the letter of the law which sets the parameters of constitutional analysis, but also the true purposes and effect. Both PINS and delinquency proceedings are civil in nature, although the latter has been referred to as quasi-criminal in that the panoply of due process rights afforded an adult defendant in a criminal action are now applied to a child respondent in the delinquency proceeding. The burden of proof at fact-finding in both proceedings is beyond a reasonable doubt (Family Ct Act § 342.2 [2]; § 744 [b]). Only evidence that is competent, material and relevant may be admitted at fact-finding (Family Ct Act § 342.2 [1]; § 744 [a]). Both proceedings authorize a prepetition hearing to determine whether the court appears to have jurisdiction over the child (Family Ct Act §§ 307.4, 728). Both proceedings authorize detention of the child after the filing of the petition and prior to the order of disposition (preventive detention) upon a finding that there is a substantial probability that the child will not appear in court on the adjourned date or that there is a serious risk that the child may before the return date do an act which if committed by an adult would constitute a crime (Family Ct Act § 320.5 [3]; § 739 [a]). Both proceedings provide that only evidence that is material and relevant may be admitted at a dispositional hearing and that an adjudication at the conclusion of the dispositional hearing must be based on a preponderance of the evidence (Family Ct Act §§ 350.3, 745). Both proceedings mandate that the appropriate dispositional order reflect the child’s best interest (Family Ct Act § 352.2 [2]; § 754 [2]). The purpose of both proceedings is to provide due process of law to determine whether a child is a juvenile delinquent or a person in need of supervision and to fashion an appropriate dispositional order (Family Ct Act §§ 301.1, 711). The disposi-tional alternatives under both proceedings are also similar and include, inter alla, probation or placement (Family Ct Act §§ 352.2, 754).
Significantly, the determination that the child is in need of supervision under article 7 is made at fact-finding whereas the determination that the child is a juvenile delinquent under *288 article 3 is made at disposition.[4] The rationale for this arises by virtue of the fact that despite a fact-finding that the child committed an act which if committed by an adult is a crime, the juvenile delinquency petition must be dismissed unless the court determines that “the respondent requires supervision, treatment or confinement” (Family Ct Act § 352.1 [1]). Therefore it is not the criminal offense itself which is determinative, but the life experience of the child, the need of the child for supervision, treatment or confinement. As every child is deemed in some form of custody unless emancipated, the order of the constituent elements of consideration at disposition in article 3 is elucidating: first — supervision, second — treatment, and last — confinement. Confinement of necessity embraces a form of supervision. Similarly, treatment of necessity embraces a form of supervision. In Family Court it is the concept of supervision which is the key to an intelligent and reasoned application of the social and jurisprudential tenets at the heart of juvenile justice. What is expected of every parent and of the State in its role as parens patriae regarding the custody of children is proper supervision and guardianship.
It is ironic that justification for failing to protect and meet the needs of a child in need of supervision resides in the claimed distinction that it is a status offense. The reality of the child, whether in article 7 or article 3, transcends the label. Delinquency is similarly a status offense, albeit having its genesis in a criminal offense. This is why the child who offends the criminal law obtains the label juvenile delinquent upon an adjudication that the child requires, needs and must have some effective type of supervision. The delinquent child is a person in need of supervision. The goal to be achieved by society whether by way of article 7 or article 3 is the same — the rehabilitation, the nurturing and the protection of the child. Labels must not disguise the truth.
While both article 3 and article 7 permit preventive detention when nonpunitive, to safeguard and meet the needs and best interest of the respondent and to protect the community, only in article 3 may that detention be secure. In article 7 all detention must be nonsecure, no matter how patent the danger to the child respondent or to the community. Study of the his *289 tory of juvenile justice in New York and of the Family Court Act and an understanding of the public policy of New York relating to meeting the needs of and protecting children proclaims this as absurd. Such failure by the State to equally protect PINS children in need of supervision as it protects delinquent children in need of supervision is not merely an act of omission, it is also an act of commission, an overt engendering in the young PINS child of a disrespect for the rule of law. This is folly.
Respondents in article 7 are educated or will inevitably be educated in the “School of the Streets” that absconding from nonsecure detention carries no penalty, no consequence, unless in rebelling against authority by endeavoring to or succeeding in absconding, they commit an act or acts which if committed by an adult constitute a crime. The absence of the power to remand to secure detention in PINS litigation to meet the needs and the best interest of and to protect the respondent is a cancer that enfeebles the public policy envisioned by the creation of Family Court. In many instances, parents have already exhausted all reasonable means to secure compliance with appropriate household rules and regulation by their absconding child. They come to Family Court as a last resort. Remand to the Commissioner of Social Services merely substitutes an agency and its employees for the parent. Unless there is an expectation that parental authority may be enforced and reenforced, the PINS child will ignore or treat that authority with contempt. The PINS child as well as the delinquent child is entitled to the equal protection of the laws. To deprive Family Court of the power to advance the welfare of the PINS child while maintaining such power in the court to advance the good of the delinquent child, and to do so for monetary consideration alone, is to arbitrarily discriminate without just cause and right reason.
It is remarkable that New York in abrogating secure detention for PINS children did so to obtain Federal funds pursuant to 42 USC § 5633, which itself did not demand such abrogation in order for the State to obtain the Federal funding.[5] The Federal enactment provides that in order to receive formula grants under the enactment, a State shall submit a plan for *290 carrying out its purposes which, inter alla, requires the following: “(12)(A) provide within three years after submission of the initial plan that juveniles who are charged with or who have committed offenses that would not be criminal if committed by an adult or offenses (other than an offense that constitutes a violation of a valid court order or a violation of section 922(x) of Title 18 or a similar State law), or alien juveniles in custody, or such nonoffenders as dependent or neglected children, shall not be placed in secure detention facilities or secure correctional facilities” (42 USC § 5633 [a] [12] [A] [emphasis supplied]).[6] Accordingly, New York, in conformance with the Federal dictate regarding preventive detention and dispositional orders in PINS proceedings, could have provided that the detention of a child in a secure detention facility under article 7 shall not be directed unless it is found that the child violated a valid order of the court. This simple expedient would allow Family Court to effectively interrupt the cycle of the absconding PINS child as exemplified by the history of the instant PINS proceeding against Jennifer G. Family Court could minister to the needs of PINS children without the need to have recourse to article 3 to insure the necessary security for the welfare of the PINS child. PINS children would not be abandoned to their self-will, no matter how misguided and dangerous. The equal protection of the laws would cease to be an exercise in semantics, but obtain practical relevance for the PINS child. Of course the State would have to provide appropriate secure detention facilities for PINS children who qualify. However, the coveted Federal funding would not be lost and sanity would be restored to article 7. This is a small price for justice for *291 PINS children and for their families and one which a compassionate and sane society should be prepared to pay.[7]
Family Court Act § 156, entitled “Contempts,” provides: “The provisions of the judiciary law relating to civil and criminal contempts shall apply to the family court in any proceeding in which it has jurisdiction under this act or any other law, and a violation of an order of the family court in any such proceeding which directs a party, person, association, agency, institution, partnership or corporation to do an act or refrain from doing an act shall be punishable under such provisions of the judiciary law, unless a specific punishment or other remedy for such violation is provided in this act or any other law.” Family Court is a court of record (NY Const, art VI, § 1, cl [b]; see, Family Ct Act § 113). The general powers of courts of record are delineated in Judiciary Law § 2-b which states, inter alia, that a court of record has power “3. to devise and make new process and forms of proceedings, necessary to carry into effect the powers and jurisdiction possessed by it.” As aptly noted in Gabrelian v Gabrelian (108 AD2d 445, 448-451 [2d Dept 1985], appeal dismissed 66 NY2d 741):
“It is our view that courts of record (Judiciary Law § 2) are vested with inherent powers, which are neither derived from nor dependent upon express statutory authority, and which permit such courts to do all things reasonably necessary for the administration of justice within the scope of their jurisdiction (Langan v First Trust & Deposit Co., 270 App Div 700, affd 296 NY 1014).[8] The so-called ‘inherent powers doctrine’ has been aptly described as follows: ‘Under the inherent powers doctrine a court has all powers reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence and integrity, and to make its lawful actions effective. These powers are inherent in the sense that they exist because the court exists; the court is, therefore, *292 it has the powers reasonably required to act as an efficient court. Inherent judicial powers derive not from legislative grant or specific constitutional provision, but from the fact it is a court which has been created, and to be a court requires certain incidental powers in the nature of things. (Carrigan, Inherent Powers of the Courts, National College of the State Judiciary, Reno, Nevada [1973].)’ (Matter of People v Little, 89 Misc 2d 742, 745, affd 60 AD2d 797.) A court’s inherent powers are derived from the very fact that the court has been created and charged with certain duties and responsibilities; they are those powers which a court may call upon to aid in the exercise of its jurisdiction, in the administration of justice, and in the preservation of its own independence and integrity; such powers have been recognized since the days of the Inns of Court in common-law English jurisprudence (Eichelberger v Eichelberger, 582 SW2d 395, 398-399 [Tex]; see also, Jacobson v Avestruz, 81 Wis 2d 240, 244-248, 260 NW2d 267, 269-270; 20 Am Jur 2d, Courts, §§ 78-79) * * *
“In Plachte v Bancroft Inc. (3 AD2d 437, 438), the Appellate Division, First Department, stated: ‘It is ancient and undisputed law that courts have an inherent power over the control of their calendars, and the disposition of business before them’ (see also, Travelers Ins. Co. v New York Yankees, 102 AD2d 851, 852; Judson v Three D Bldg. Corp., 18 AD2d 232, 234; Taks v Stern, 14 AD2d 585, 586; cf. People v Douglass, 60 NY2d 194)* * *
“In addition, a court has the inherent power to take necessary steps to permit it to exercise its jurisdiction and to protect it from unreasonable restraint. For example, a court has the inherent power to make an ex parte order requiring the legislative branch of government to secure suitable facilities for the transaction of court business (In re Courtroom & Off. of Fifth Branch Circuit Ct., 148 Wis 109, 134 NW 490), to order the legislative body empowered to approve fiscal appropriations to authorize payment for necessary supplies to conduct court business (State ex rel. Kitzmeyer v Davis, 26 Nev 373, 68 P 689), to order the county clerk to enter a judgment directing the county treasurer to pay a court stenographer for a transcript for an appeal in a criminal case (Matter of People v Little, 89 Misc 2d 742, affd 60 AD2d 797, supra), and to order the county sheriff to provide security services for courts sitting within the county (Matter of Spike, 99 Misc 2d 178; see generally, Pena v District Ct., — Col —, —, 681 P2d 953, 957; Cratsley, Inherent Powers of the Courts, National Judicial College [1980]) * * *
*293 “Finally, although the contempt power has now been codified in this State (see, Judiciary Law art 19), it has long been recognized that courts have the inherent power to enforce respect for and compliance with their judgments and mandates • by punishment for contempt, which power is not dependent upon any statute (Roadway Express v Piper, 447 US 752, 764-765; Shillitani v United States, 384 US 364, 370; De Lancey v Piepgras, 141 NY 88, 96; People ex rel. Stearns v Marr, 88 App Div 422, mod on other grounds 181 NY 463; McKendry v McKendry, 202 Misc 312, revd on other grounds 280 App Div 440). At English common law, courts were recognized to possess the inherent power to punish, by process of contempt, any disregard of judicial authority, both for the benefit of litigants, i.e., civil contempt, and for the preservation of their own order and dignity, i.e., criminal contempt (Matter of Douglas v Adel, 269 NY 144, 146; Matter of Barnes, 204 NY 108, 113-114; People ex rel. Platt v Rice, 144 NY 249, 263; People ex rel. Munsell v Court of Oyer & Terminer, 101 NY 245, 249-250; Continental Mtge. Guar. Co. v Whitecourt Constr. Corp., 164 Misc 56; Silverman v Seneca Realty Co., 154 Misc 35). This power became a part of the State’s common law and formed the source of the early State statutes pertaining to contempt (Matter of Douglas v Adel, supra; Matter of Barnes, supra; People ex rel. Platt v Rice, supra) * * *
“The foregoing examples are merely illustrative, and are not meant to define the exact perimeters of the power inherent in the courts of record of this State. Indeed, the inherent power, is, by its very nature, not susceptible to precise definition (De Lancey v Piepgras, 141 NY 88, 96, supra).”[9]
A fundamental axiom of our constitutional system is that governmental powers are divided among three branches of government — judicial; executive and legislative. Each branch is separate from and may not infringe on the independence of the others (20 NY Jur 2d, Constitutional Law, § 151). “Also, it has been said that if there was one desideratum sought more than all others by the framers of our national and state Constitutions it was that no one of the three co-ordinate branches of our government should overlap or impinge on the rights of the other two, each being supreme in its own department, and the combined strength of all three lying in the independence of the other” (20 NY Jur 2d, Constitutional Law, § 152). The State Legislature, having granted Family Court exclusive original *294 subject matter jurisdiction over PINS proceedings (Family Ct Act § 115 [a] [v]), cannot deprive Family Court of the power to enforce, implement and effect the policy and goals inherent in that subject matter jurisdiction. If the Legislature removes such subject matter jurisdiction from Family Court, the court cannot complain. However, since the subject matter jurisdiction has not been removed and since the age limitation with respect to that jurisdiction may be increased to age 18 by the Legislature, it is imperative that the Legislature recognize the constitutional dimensions of its ill-advised determination to deprive Family Court of its inherent power as a court of record to enforce its orders. It makes no difference that such determination wears the guise of a social policy pronouncement that PINS respondents may never be held in secure detention.[10]
Echoes of the “inherent powers doctrine” are perceived in Matter of Darren H. (179 Misc 2d 130). In that PINS proceeding, Family Court instructed the Commissioner of Social Services to take all reasonable steps to secure the appearance of respondent. All reasonable steps may well require the Commissioner to de facto convert a nonsecure facility within his control to a locked facility, that is a secure facility, devoted to meeting the needs of, protecting and treating PINS children only. Should the Legislature be unduly concerned with fiscal implicatians in advancing the welfare of needy PINS children, it should be noted that pursuant to statute, a Commissioner of Social Services is obligated to seek parental support on behalf of destitute, neglected, abused and abandoned children, as well as for children who have been adjudicated juvenile delinquent or a person in need of supervision. (See, Social Services Law § 398 [6] [e]; see, e.g., Matter of Jesmer v Dundon, 29 NY2d 5 [1971]; Matter of Pandozy v Murphy, 222 AD2d 145 [3d Dept 1996]; Matter of Cook v Temple W., 134 Misc 2d 609 [Fam Ct, NY County 1987].)
To reiterate, Family Court Act § 720 was amended in 1978 to reflect in then subdivision (3) that once the director of the State Division for Youth certifies that a county has available *295 adequate nonsecure detention facilities or that the City of New York has adequate nonsecure detention facilities, a child alleged or adjudicated to be a person in need of supervision may not be placed in a secure detention facility (L 1978, ch 548, § 1). The rush to abolish secure detention for PINS children was prompted by financial considerations, to wit: the obtaining and insuring of continued Federal funding to the State under the provisions of the Juvenile Justice and Delinquency Prevention Act of 1974 and the avoidance of higher costs involved with secure detention facilities for needy PINS children (see, 1980 Opns Atty Gen 33). While blind to the provision of the Federal enactment authorizing secure detention for PINS children who violate a valid order of the court, and immune to the concept that valid treatment for a needy PINS child may, of necessity, require a secure PINS setting, the argument in support of the law mandating that PINS children not be placed in secure facilities was articulated as follows:
“The Federal Juvenile Justice Delinquency Prevention Act of 1974 requires that all alleged or adjudicated PINS be phased-out of secure detention facilities by 1980 * * * It is essential that the State comply with this requirement in order to remain eligible for Federal funding under this Act * * *
“The cost for maintaining a youth in secure detention is substantially higher than the cost of non-secure detention. This bill would shift the PINS population currently being detained in secure detention into the less expensive non-secure settings thereby decreasing costs for both the State and the localities” (Budget Report, Bill Jacket, L 1978, ch 548.) Perhaps conscious of the emphasis on monetary consideration only, a social premise, conclusory at best, is then urged as further rationalization for this extraordinary emasculation of the public policy underlying article 7 and the court’s power: “Children who are adjudicated as PINS tend to have committed less serious offenses than those who are adjudicated as Juvenile Delinquents. The non-secure detention placement is more appropriate for the needs of the PINS population.” (Ibid.)
Of course, what has occurred is that a judicial determination vouchsafed to Family Court is now rendered in the guise of a legislative determination with respect to all PINS children as a class regardless of their individual needs and life experiences. This is hubris. It is wrong. It is flawed. It is usurpation. The excuse for such usurpation is voiced as follows: “It could be argued that this bill will limit the flexibility exercised in making detention placements. However, the bill may also encour *296 age Family Court judges to make the appropriate adjudications the first time a youth enters the juvenile justice system. Under the current law, judges frequently adjudicate a youth as a PINS even though the crime committed may warrant assigning him Juvenile Delinquent status. If Family Court judges knew that their adjudication decisions will determine the type of detention setting a youth is placed in, they may be less inclined to make adjudications that are incompatible with the crime.”[11] (Budget Report, Bill Jacket, L 1978, ch 548.) Hypocrisy and “kafkaesque” reasoning, it appears, are not strangers to masking the neglect of PINS children under the guise of legislative policy in order to conserve and build upon the public purse. Apart from the lack of recognition of principles of appellate review to correct possible erroneous judicial determination by the trial court, all within the judicial branch of government, the reality that PINS children are a low priority in terms of fiscal implication is abundantly clear.
Dismay is the only reasoned response when one studies the legislative history of this policy determination. The total absence in the entire legislative history of the amendments to Family Court Act § 720 whereby secure detention for the PINS child was forbidden by act of legislative will regardless of any circumstance, any peril, any harm threatening the PINS child, based on monetary consideration alone and clothed with con-elusory and dubious expressions of vague social prerogatives, gives the lie to the masquerade that justice, compassion, well-being and truth may only be accomplished by platitudes. It does so in complete disregard of the dictate of the Federal enactment that the dignity of the judicial branch of government and the needs of the PINS child be met with appropriate nonpunitive secure detention when a valid court order is violated.
Ultimately the ability to mandate treatment services for the child and compliance by the child with such services under *297 articles 3 and 7 reposes in the power of Family Court. The exercise of that power is not beyond review, but is subject to oversight and criticism when warranted. To eviscerate that power is to reduce article 7 to a remedy without substance, a hollow form and a false hope. If the State Legislature were to remove secure detention as a possible exercise of power by the Family Court where appropriate and warranted in an article 3 (delinquency proceeding), the protests would be deafening. That they have done so in article 7 amidst a roaring silence is ample testimony that the ideals envisioned in the creation of Family Court are far from being realized.
The dictum “penny wise, pound foolish” echoes the value our society places on its children. This court earnestly and urgently requests that the other branches of government, the executive and the legislative, revisit the issue of secure detention for PINS children for all of the reasons delineated above. To that end, it is requested that if the power is not restored, the Legislature remove article 7 from the Family Court Act so that Lady Justice is not mocked.[12] To that end, this court, because its conscience wills it so, pledges that it will endeavor at all times to meet the needs of PINS children even if that endeavor requires, to the extent permitted by existing power and law, the invocation of article 3 as a means to accomplish justice for the PINS child.[13]

. Family Court Act § 739 (a) authorizes preventive detention for a juvenile in a PINS proceeding for the same reasons as permits such detention in an article 3 delinquency proceeding:
“the court shall not direct detention unless it finds and states the facts and reasons for so finding that unless the respondent is detained:
“(i) there is a probability that he will not appear in court on the return date; or
“(ii) there is a serious risk that he may before the return date do an act which if committed by an adult would constitute a crime.” (Emphasis supplied.)

. An absconding respondent from nonsecure detention in a PINS proceeding may not be charged with escape in the second and third degrees whether in an adult criminal action or a juvenile delinquency proceeding. Why? Because the detention is in a nonsecure facility and such does not constitute a detention facility within the meaning of Penal Law § 205.00 (1). (Matter of Sylvia H., 78 AD2d 875 [2d Dept 1980]; People v Dupont, 179 Misc 2d 79 [Oneida County Ct 1998]; see also, Matter of Joe A., 171 Misc 2d 241 [Fam Ct, NY County 1996]; cf., People ex rel. Kaufmann v Davis, 52 AD2d 931 [2d Dept 1976].)

. The only exception to the mandate that a finding declaring a respondent under article 3 to be a juvenile delinquent occur at disposition is Penal Law § 265.05 (“Unlawful possession of weapons by persons under sixteen”) which states, inter alia: “A person who violates the provisions of this section shall be adjudged a juvenile delinquent.”

. The legislative history of the Federal enactment (Juvenile, Justice and Delinquency Prevention Act of 1974 [Pub L 93-415]) discloses a preference that PINS-type offenses be channeled out of the formal court system. However, that same history reflects genuine concern that the needs of PINS children be met. As set forth in the “Statement of the Problem”:
*290 “These juvenile status offenders generally are inappropriate clients for the formal police courts and corrections process of the juvenile justice system. These children and youth should be channeled to those agencies and professions which are mandated and in fact purport to deal with the substantive human and social issues involved in these areas * * *
“The essential problem is one of delivering needed services or attention in such a way and at a time that may be crucial in preventing the development of a criminal career. The incidence of juvenile status offenses is so high as to warrant major innovations in coping with this pre-delinquent or potentially delinquent behavior.” (Sen Rep No. 93-1011, 93d Cong, 2d Sess, reprinted in 1974 US Code Cong & Admin News 5283, 5287-5288 [emphasis supplied].)

. Section 922 (x) of title 18 of the United States Code states that, with certain enumerated exceptions, it shall be unlawful for any person who is a juvenile to knowingly possess a handgun or ammunition that is suitable for use only in a handgun. The term juvenile for purposes of this subdivision means a person who is less than 18 years of age.

. According to the office of Counsel of the Office of Court Administration, there are at least seven bills pending before the Legislature which seek to expand Family Court PINS jurisdiction from 16 years to 18 years (see, Family Ct Act § 712 [a]; Matter of Patricia A., 31 NY2d 83 [construing statutory age differential for PINS between males and females as violative of the Equal Protection Clause]). It is reported on information and belief that parents who testified before the legislative committee were zealous in advocating for expansion of PINS.

. Historically, inherent powers have been said to reside only in courts of superior jurisdiction, and not in inferior courts, i.e., courts not of record (Matter of Burge, 203 Misc 677, revd on other grounds 282 App Div 219, affd 306 NY 811; People ex rel. Walsh v Ashworth, 185 Misc 391).

. See, Wehringer v Brannigan, 232 AD2d 206, appeal dismissed 89 NY2d 980, rearg denied 89 NY2d 1087.

. Family Court Act § 711, “Purpose,” states: “The purpose of this article is to provide a due process of law (a) for considering a claim that a person is in need of supervision and (b) for devising an appropriate order of disposition for any person adjudged in need of supervision” (emphasis supplied). If it is posited that circumstances may arise whereby supervision to insure treatment for and protection of the PINS child mandates a secure setting devoted to rehabilitative nonpunitive goals, then the failure to provide such security would violate the appropriateness of the order of disposition. (See, Matter of D.L.D., 110 Wis 2d 168, 327 NW2d 682 [1983].)

. This rationale adds “insult to injury.” It suggests that Family Court Judges, as a matter of course, tend to make inappropriate adjudications the first time a child enters the juvenile system. It ignores the discretion vested in Family Court to convert an article 3 delinquency proceeding to an article PINS proceeding. It focuses only on the underlying offense while disregarding the fact that it is not the offense, but the best interests of the child and the protection of the community insofar as that child requires supervision which governs disposition. It, in effect, is a call to convert PINS article 7 to delinquency article 3 to assure an appropriate secure setting to meet the needs of PINS children as warranted. Not only is this concept not authorized by statute, it might, if undertaken, have serious fiscal implication.

. If Family Court Act § 720 is not amended to remove the implication that it is constitutionally infirm as violative of the equal protection of the laws and of the “inherent power of the court” doctrine, then it may devolve on the judicial branch of government to insist that the dignity of the law and the needs of PINS children not be compromised.

. At disposition on July 2, 1999, respondent Jennifer G. was found in the article 3 proceeding to be in need of supervision and treatment. Accordingly, she was declared a juvenile delinquent and placed with OCFS (Office of Children and Family Services) unspecified for 12 months in a facility with an appropriate psychotherapeutic component. The following private nonse-cure facilities rejected respondent’s candidacy for their programs based on her history of absconding: Edwin Gould Academy, Hawthorne Cedar Knolls, St. Cabrini and St. Christopher/Jeanie Clarkson. The court directed OCFS to report in court on July 30, 1999 as to which facility was selected and what services are in place for respondent. The court further directed that on June 21, 2000, OCFS was to report to the court as to the cooperation by respondent with a view toward possible conversion of the article 3 proceeding to an article 7 PINS proceeding. The pending article 7 PINS proceeding as to respondent was dismissed as academic in view of the disposition under article 3. (See also, Matter of Bryan JJ., 175 AD2d 416 [3d Dept 1991].)