26 P.3d 562

**In the Interest of Jane DOE, Born on June 16, 1983, Minor–Respondent.**

No. 21876.

Supreme Court of Hawai'i.

April 30, 2001.

Reconsideration Denied July 19, 2001.

James M. Anderson, on the briefs, Honolulu, for petitioner-appellee.

Theodore Y.H. Chinn, for respondent-appellant.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, JJ., and Circuit Judge BAXA *, assigned by reason of vacancy.

Opinion of the Court by NAKAYAMA, J.

We granted the application for a writ of certiorari, filed by petitioner-appellee State of Hawai'i (the prosecution), in order to review the published opinion of the Intermediate Court of Appeals (ICA), *In re Jane Doe*, 95 Hawai'i 340, 22 P.3d 987 (1999), wherein the ICA reversed the July 1, 1998 findings, order, and decree of the family court of the first circuit finding respondent-appellant Jane Doe (Doe) in criminal contempt for violating a order of protective supervision issued by the family court. The ICA ruled that Doe received insufficient notice of the court order and the consequences of violating it and that, in any event, the family court statute, Hawai'i Revised Statutes (HRS) chapter 571 (1993 & Supp.1999), bars the family court from adjudicating "status offenders" [1] such as Doe as "law violators" in criminal contempt. We disagree on both points and, accordingly, reverse the ICA opinion and affirm the decision of the family court.

## I. BACKGROUND

Doe, born in Honolulu, Hawai'i on June 16, 1983, began attending the Wai'anae Interme-

---

* Acting Associate Justice Baxa, was assigned by reason of the vacancy created by the resignation of Justice Klein, effective February 4, 2000. On May 19, 2000, Simeon R. Acoba, Jr. was sworn-in as associate justice of the Hawai'i Supreme Court. However, Acting Associate Justice Baxa remains on the above-captioned case, unless otherwise excused or disqualified.

1. HRS § 571–2 (1993) defines "status offender" as "any child coming within the family court's jurisdiction under section 571–11(2)(B), (C), or (D). Such child is distinguished from (A) a law violator under section 571–11(1) who comes into the family court upon allegations such person has committed an act which would constitute a crime if committed by an adult...."

diate School in 1995. Due to chronic truancy, Doe has repeated the seventh grade three years in a row.

On December 3, 1997, Doe's school counselor prepared a document, entitled "precourt interventions," listing the multiple unsuccessful "intervention efforts" by the school over the several previous years and recommending a plan of service including "[j]oint protective supervision to [family court and the Department of Education (DOE)]." On December 19, 1997, the State of Hawai'i (the State), through DOE, filed a petition against Doe alleging a violation of Hawai'i Revised Statutes (HRS) § 571-11(2)(C) (1993) [2] based on 49 days of unexcused absences between September 3 and November 26, 1997.

A hearing was held on January 14, 1998. Doe, her mother, and several probation officers signed a "rights form" stating in relevant part:

> I will be asking you questions about your case, recently referred to the Family Court, but before starting, I must explain your legal rights.
>
> 1. You have a right to have a lawyer. Your family may hire a lawyer for you, or if your family is unable to afford it, the court may appoint a lawyer to represent you.
>
> 2. You have a right to remain silent. You do not have to say anything to me or to the Judge. Anything you say may be used against you in court.
>
> 3. You have a right to a trial. A trial is a court hearing before a Judge regarding any charge or complaint against you. You

can bring your own witnesses to testify at your hearing or you can ask the court to order certain witnesses to attend. Your lawyer may question the witnesses who testify against you.

A "referral history" submitted by Michelle Hussey (Hussey), a court officer, on January 20, 1998 indicates that Doe admitted to the truancy violation without legal counsel.

After the hearing, the family court issued an order placing Doe under the protective supervision of the DOE and the court and requiring Doe to perform 20 hours of community service within 60 days of assignment. The order also provided: "Probation Officer shall make a referral to have minor undergo a psychological evaluation through [DOE];" and "DOE shall make a referral to the appropriate prosecuting attorney to file a contempt of court if minor fails to · attend school."

In addition to its order, the court filed two documents stating the rules of· protective supervision of the DOE and of the court. The DOE's rules provided in relevant part:

> You have been placed under protective supervision to [DOE] until further order. This period may be extended by the Court.
>
> While you are under this protective supervision, you must follow these rules:
>
> 1. You are to attend Waianae Int. School or any school or program as directed by the Department of Education.
>
> . . . .
>
> 2. You are to attend each day and every class.
>
> . . . .

---

2.  HRS § 571-11 provides in relevant part:
    **Jurisdiction; children.** Except as otherwise provided in this chapter, the court shall have exclusive original jurisdiction in proceedings:
    (1) Concerning any person who is alleged to have committed an act prior to achieving eighteen years of age which would constitute a violation or attempted violation of any federal, state, or local law or municipal ordinance. Regardless of where the violation occurred, jurisdiction may be taken by the court of the circuit where the person resides, is living or is found, or in which the offense is alleged to have occurred.
    (2) Concerning any child living or found within the circuit:

(A) Who is neglected as to or deprived of educational services because of the failure of any person or agency to exercise that degree of care for which it is legally responsible;

(B) Who is beyond the control of the child's parent or other custodian or whose behavior is injurious to the child's own or others' welfare;

(C) Who is neither attending school nor receiving educational services required by law whether through the child's own misbehavior or nonattendance or otherwise; or

(D) Who is in violation of curfew.

4. The only excuse that will be accepted by the school and the counselor is a medical verification of your illness by a doctor, clinic or school nurse. This note must specifically state that the illness prevents you from attending school or counseling. The school or counselor can only excuse you the date of the note unless it states the dates you can be excused.

5. If you are having problems in school or if you wish to make changes in your program, you must contact the school counselor.

. . . .

IF YOU FAIL TO OBEY THE ABOVE RULES, YOU MAY BE ORDERED TO PERFORM COMMUNITY SERVICE. MAJOR VIOLATIONS MAY RESULT IN DETENTION.

THESE RULES WILL BE ATTACHED TO A COURT ORDER AN[D] WILL BE A PART OF THAT COURT ORDER.

(Emphasis added.)

The family court's rules of protective supervision stated in relevant part:

You have been placed under protective supervision of this Court by authority of the laws of the State of Hawaii. A court officer or agency has been assigned to help you during your supervised period.

While you are under this protective supervision, you are to follow these rules, and any added rules set forth below:

1. You are to obey laws of the City and County of Honolulu, State of Hawaii and U.S. Government. Failure to do so may change your status to that of **"LAW VIO-LATOR."**

. . . .

4. You must attend your classes at school regularly, unless excused by the school or by this Court. At school you are not to behave in any manner which might cause you to be suspended or expelled.

. . . .

6. You are not to remain away from your residence overnight without first having permission from your parent(s), guardian(s), or foster parent(s).

. . . .

10. However, ask for help when you think you need it. The purpose of your protective supervision is to give you assistance in keeping out of trouble which might result in your violating the law.

. . . .

IF YOU FAIL TO OBEY THE ABOVE RULES, IT MAY BE NECESSARY FOR THE COURT TO TAKE FURTHER AC-TION.

(Emphasis in original.)

Doe signed the DOH rules, along with her mother and Hussey, under the statement: "THESE RULES WERE EXPLAINED TO ME AND I UNDERSTAND THEM." (Emphasis in original.) Doe, the judge, and Hussey signed the family court's rules under the statement: **"THE ABOVE RULES OF MY PROTECTIVE SUPERVISION HAVE BEEN EXPLAINED TO ME. I UNDER-STAND AND ACCEPT THEM. I AGREE TO FOLLOW THE RULES AND TO CO-OPERATE WITH MY COURT OFFI-CER."** (Emphasis in original.)

On January 29, 1998, Doe was arrested by the police and detained. On January 30, 1998, the prosecution filed a petition against Doe for violating rule 6 of the family court's rules, specifically, "le[aving] home without permission and remain[ing] away until apprehended." Later that day, the court issued an order authorizing Doe's early release to her mother after a psychological evaluation. The court also issued an order continuing Doe's protective supervision and providing that a "Contempt of Court hearing (petition) shall be set before [the court]." The record does not indicate that any hearing was scheduled in relation to the January 1998 incident.

On February 9, 1998, Jean Anderson (Anderson), clinical psychology graduate student, and Patricia Harnish, Ph.D. (Dr. Harnish), clinical psychologist for the family court liaison branch, jointly submitted an extensive "psychological evaluation" of Doe based on interviews on January 27, 28, and 30, 1998. Based on a review of Doe's history and present status, Dr. Harnish and Anderson concluded that Doe "is aware of what she needs to do to improve her situation, but does not seem to have the self-discipline and self-motivation to follow

through with what she needs to do.... Because of this, [she] may need a more structured environment to encourage school attendance on a daily basis." Dr. Harnish and Anderson recommended a detailed plan of treatment including mental health and support services, individual therapy, family therapy, school-based services, and, "if [Doe still] fails to attend school on a regular basis ..., placement in a more structured setting, i.e., group home, to monitor school attendance and behaviors in and out of school."

On April 3, 1998, the prosecution filed two petitions pursuant to HRS § 571–11(2) alleging that Doe violated Rule 4 of the family court's rules by failing to attend classes on February 3–17, 19–23, 25, 26, 1998 and March 2–31, 1998. On April 27, 1998, the prosecution filed another petition stating that "[Doe] appears to come within the purview of [HRS § 571–11(1), see supra note 2], in that [Doe] ... did knowingly disobey and resist the process, injunction or other mandate of a court ..., thereby committing the offense of Criminal Contempt of Court in violation of [HRS § 710–1077(1)(g) (1993)]."

Trial on the criminal contempt petition was held on July 1, 1998. The court took judicial notice of the records and files in this case, including the January 14, 1998 protective supervision order and rules. Doe's teacher and vice-principal at Wai'anae Intermediate testified regarding Doe's truancy.

Hussey testified, maintaining that she reviewed "each and every rule under the protective supervision rules" with Doe and asked her if she understood, after which "[Doe] acknowledged that she did and then signed and dated the rules'...." On cross-examination, Doe's counsel asked Hussey if she "inform[ed][Doe] what a contempt of court is." Hussey replied: "I reviewed her legal rights with her. I don't recall whether or not I reviewed contempt charges, what that meant."

Doe testified. The transcript reads in relevant part:

Q [DEFENSE COUNSEL] ... [D]o you remember what happened on that court date [January 14, 1998]?

A The Judge gave me orders to go to school, but then they didn't tell me about the, what contempt of court was—and if I violate it and what would happen.

Q Did you have an attorney with you—

A No.

Q —on that date? So you didn't have any legal representation?

A I'm not sure.

Q Did the Public Defender's Office represent you on that date?

A No.

Q Then you were basically by yourself?

A Yeah, with my mom.

Q Okay. When [the court], now how did [the court] tell you about the contempt of court?

. . . .

A I'm not sure. He just, I gave my mom the paper, yeah, with the, I have to go to school and, I think he told me if I don't go to school, then I'll be put in DH or something like that.

. . . .

Q Did you understand what a contempt order is?

A No.

The court ruled that the protective supervision order was valid and that "[Doe] had actual proper notice of it." "[S]atisfied by proof beyond a reasonable doubt that the material allegations on the petition for criminal contempt of court have been proven," the court "adjudicated Doe as a law violator under [HRS § 571–11(1)]."

During the disposition phase of the trial, Gordean Akiona (Akiona), a court officer, recommended that Doe be placed on probation and confined to a detention home until July 5, 1998, that Doe and her family continue in counseling, and that the orders of protective supervision and community service be revoked. The representative of DOE joined the recommendation based on Doe's "willful and intentional disobedience of this Court." Doe disagreed, emphasizing her ongoing counseling program and recommending community service instead.

At the request of the DOE, the court received Doe's February 9, 1998 psychologi-

cal report, her recent attendance records, and a progress report written by her school counselor, Linsey Ho (Ho). Ho also addressed the court in person, raising her concern that Doe would be starting her fourth year as a seventh grader. Ho opined that "the only alternative we have, you know, because she is getting older . . ., we could be looking at [an alternative school]," but that, "again, the question is getting her to school."

The court adopted Akiona's recommended disposition, issuing an order revoking Doe's protective supervision and community service requirement, placing her on probation until further order of the court, mandating her confinement in a detention home until July 5, 1998, and directing her to continue counseling with the Department of Health. The court also dismissed the two protective supervision Rule 4 violations as "moot." The court addressed Doe at length, stating in relevant part:

> Okay. [Doe], I hope someday you'll be able to look back at this whole experience and while it may seem painful to you now, I'm hoping you'll look back at all this and say, you know, it's a good thing that the Court took a hard stance and a hard line with me because if not, you might not have gotten back to school.
>
> You gotta go to school. I think you know that. I think if you reflect seriously about it, you just gotta go to school. There's no two ways about it. You gotta get an education. You gotta go to school. If you go to school, your grades will get better.
>
> There were influences in your life. . . . You're making changes now by what you tell me, you know, meeting with your counselor, and that's all fine and well and I commend you, I congratulate you for that. You're taking a step in the right direction.
>
> But, there's gotta be a consequence for your nonattendance of school, and accordingly, I will order [the aforementioned disposition].
>
> . . . .
>
> Like I said earlier, I hope this is your last and final wake-up call and that you will go back to school and everything will go smooth from here, probation will be fine

and you'll be off probation in no time. That is my hope. I hope [detention home] is going to be enough to shake you up (inaudible) being your wake up call.

> I hope not to see you back here again in court, but it's kind of your last, last wake-up call. It's up to you. You've gotta, you're fifteen years old, rapidly becoming an adult and you need to get things together for yourself. ·

On July 16, 1998, Doe filed a motion for reconsideration of her adjudication as a law violator. At the August 10, 1998 hearing, the court granted the motion for the sole purpose of ordering the State to "prepare written findings" as required by HRS § 710–1077(5).

Doe appealed, and the case was assigned to the ICA. The ICA reversed the family court's order, holding that Doe did not receive adequate notice of the nature and consequences of criminal contempt. *See In re Jane Doe,* at 346 – 349, 95 P.3d at 993 – 996. The ICA also ruled, more generally, that a "status offender" cannot be adjudicated as a "law violator" under HRS § 571–11(1) for criminal contempt of court. *See id.* at 348 – 350, 22 P.3d at 995 – 997. Finally, although the ICA recognized that status offenders may be temporarily confined in secure facilities for violations of "valid court orders" as defined under the federal Juvenile Justice and Delinquency Prevention Act of 1974 (JJDPA), Pub.L. No. 93–415, 88 Stat. 1109 (codified in scattered sections of 42 U.S.C. and 18 U.S.C. (1994)), as amended, it held that the relevant requirements for "valid court orders" were not met in this case and that, thus, Doe's confinement in detention home longer than twenty-four hours was improper. *See id.* at 350 – 355, 95 P.3d at 997 – 1002.

The instant application followed.

## II. STANDARD OF REVIEW

We have previously held that the "family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." *In re Jane Doe,* 77 Hawai'i 109, 115, 883 P.2d 30, 36 (1994) (citing *Fujikane v. Fujikane,* 61 Haw. 352, 355,

604 P.2d 43, 45 (1979)). "Under the abuse of discretion standard of review, the family court's decision will not be disturbed unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant[, and its] decision clearly exceed[ed] the bounds of reason." *Doe*, 77 Hawai'i at 115, 883 P.2d at 36 (internal quotation marks and citation omitted).

We review a trial court's findings of fact (FOFs) under the "clearly erroneous" standard. *State v. Naeole*, 80 Hawai'i 419, 423 n. 6, 910 P.2d 732, 736 n. 6 (1996) (citation omitted). Under this standard, we will not disturb a FOF unless we are left, after examining the record, with a "definite and firm conviction ... that a mistake ha[s] been committed." *Id.* (citation omitted). "The test on appeal is ... whether there was substantial evidence to support the conclusion of the trier of fact. 'Substantial evidence' ... is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *State v. Wallace*, 80 Hawai'i 382, 391–92, 910 P.2d 695, 704–05 (1996) (citation omitted).

Conclusions of law (COLs) are "not binding upon an appellate court and [are] freely reviewable for [their] correctness." *Id.* at 391, 910 P.2d at 704 (citation omitted). Thus, we review COLs de novo under the right/wrong standard. *Id.* (citation omitted).

*In re Doe*, 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996).

### III. DISCUSSION

■ In its decision, the ICA ruled that the statutory distinction between "status offenders" under HRS § 571–11(2) and "law violators" under HRS § 571–11(1), *see supra* notes 1 and 2, precludes the family court from adjudicating a minor as a "law violator" under HRS § 571–11(1) for criminal contempt of court based on a violation of a court order of protective supervision. While this ruling focused on Doe's truancy, which would not be a crime if committed by an adult, in our view, it underemphasized Doe's willful violation of a lawful court order, which *would* be a criminal offense if committed by an adult. Balancing the policies of "deinstitutionalizing" status offenders, on the one hand, and ensuring effective administration of the family court's function, on the other, we hold that the family court may adjudicate status offenders under HRS § 571–11(1) for criminal contempt based on violations of court orders of protective supervision, subject to certain important limitations outlined below.

■ This court has recognized the bedrock principle that

> [t]he power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power.

*Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 510, 22 L.Ed. 205 (1873); *see Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). Likewise, the constitutional courts of Hawai'i possess the inherent power of contempt. *Kukui Nuts of Hawaii, Inc.[ v. R. Baird & Co.]*, 6 Haw.App. [431,] 436, 726 P.2d [268,] 271 [(1986)] (noting that the power to issue contempt sanctions is an inherent power of the trial courts to do those things necessary for the proper administration of justice); *Application of Balucan*, 44 Haw. 271, 353 P.2d 631 (1960) (holding that "[t]he power of summary punishment for [criminal] contempt is an inherent power of a constitutional court" (citing *Onomea Sugar Co. v. Austin*, 5 Haw. 604 (1886))).

Although the power to punish for contempt is an inherent power of the courts, the legislature may establish alternative procedures and penalties *that do not unduly restrict or abrogate the courts' contempt powers.* *See Young*, 481 U.S. at 799, 107 S.Ct. 2124, 95 L.Ed.2d 740; *Walker v. Bentley*, 678 So.2d 1265, 1267 (Fla.1996)

(holding that "[a]ny legislative enactment that purports to do away with the inherent power of contempt directly affects a separate and distinct function of the judicial branch, and, as such, violates the separation of powers doctrine . . . of the Florida Constitution) . . . ." *LeMay v. Leander*, 92 Hawai'i 614, 620–21, 994 P.2d 546, 552–53 (2000) (emphasis added). Thus, although the specific criminal contempt statute, HRS § 710–1077, and the general statutes declaring the power of the courts "to make and award such judgments, decrees, orders, and mandates . . . as may be necessary to carry into full effect the powers which are or shall be given to them by law or for the promotion of justice in matters pending before them," HRS §§ 603–21.9(6) (1993) (circuit courts) and 571–8.5 (Supp. 1999) (district family courts), provide statutory authority for punishing contempts, "th[ese] statute[s are] merely [ ] legislative restatement[s] of the courts' existing powers." *LeMay*, 92 Hawai'i at 624, 994 P.2d at 556; *see also Kukui Nuts*, 6 Haw.App. at 438, 726 P.2d at 272.

In its decision, the ICA ruled that the distinction drawn between "status offenders" and "law violators" in HRS chapter 571 necessarily exempts status offenders who violate a court order of protective supervision from adjudication and punishment as law violators. As noted above, this distinction arises in the definitions and jurisdiction provisions, *see* HRS §§ 571–2, 571–11. It also appears in

the "decree" section, HRS § 571–48 (1993),[3] which requires the court to declare jurisdiction either under HRS § 571–11(1) or HRS § 571–11(2) and limits dispositions under HRS § 571–11(2) to "plac[ing] the child under protective supervision," HRS § 571–48(2)(A), or "vest[ing] legal custody of the child . . . in a local governmental agency or institution," HRS § 571–48(2)(B).

■ The status offender who violates a court order of protective supervision, however, does nothing other than violate the law, and contempt of court is nothing other than a crime if committed by an adult. *See In re D.L.D.*, 110 Wis.2d 168, 327 N.W.2d 682, 689 (1983) ("We believe that missing school as the occasion for [HRS § 571–11(2)] jurisdiction cannot be equated legally or factually with missing school in willful and contumacious defiance of a court order. Therefore, the remedies available pursuant to [the equivalent of an HRS § 571–11(2)] order are distinguishable from the remedies available to enforce that order."); *In re G.B.*, 88 Ill.2d 36, 58 Ill.Dec. 845, 430 N.E.2d 1096, 1098 (1981) ("The contempt proceedings . . . were filed because of a violation of [a court] order. . . . This, therefore, is not a case governed by the [family court statute]. Rather, the propriety of placing this minor on probation depends upon the court's power to impose punishment for contempt for the violation of its order."); *L.A.M. v. State*, 547 P.2d 827, 836 (Alaska 1976) ("This behavior constitutes willful criminal contempt of the court's

---

3. HRS § 571–48 provides in relevant part:
   **Decree, if informal adjustment or diversion to a private or community agency or program has not been effected.** When a minor is found by the court to come within section 571–11, the court shall so decree and in its decree shall make a finding of the facts upon which the court exercises its jurisdiction over the minor. Upon the decree the court, by order duly entered, shall proceed as follows:
   (1) As to a child adjudicated under section 571–11(1):
   (A) The court may place the child on probation:
   . . . .
   (B) The court may vest legal custody of the child . . . in a youth correctional facility, in a local public agency or institution, or in any private institution or agency authorized by the court to care for children; or place the child in a private home . . . .; or

   (C) The court may fine the child for a violation which would be theft in the third degree by shoplifting if committed by an adult. The court may require the child to perform public services in lieu of the fine;
   (2) As to a child adjudicated under section 571–11(2):
   (A) The court may place the child under protective supervision, as hereinabove described, in the child's own home, or in the custody of a suitable person or agency elsewhere, upon conditions determined by the court; or
   (B) The court may vest legal custody of the child . . . in a local government agency or institution licensed or approved by the State to care for children, with the exception of an institution authorized by the court to care for children. . . .

authority; were [appellant] an adult, her actions would be characterized as a 'crime'. . . ."); *State ex rel. J.S.*, 266 N.J.Super. 423, 629 A.2d 1371 (1993) ("If the juvenile purposely or knowingly violated [a court order], with full knowledge of the consequences, [she] committed a delinquent act, taking her out of the realm of a status offender."). HRS chapter 571 does not expressly bar the family court from dealing with violators of court orders of protective supervision under its inherent authority to punish contempts and its jurisdiction over "law violators" in HRS § 571–11(1). Absent such clear direction, "we should not presume that the Legislature intended to override such long-established power." *In re Michael G.*, 44 Cal.3d 283, 243 Cal.Rptr. 224, 747 P.2d 1152, 1159 (1988). *Cf. Balucan*, 44 Haw. at 279–80, 353 P.2d at 636–37 (declining to interpret the juvenile court statute so as to deprive the court of its summary contempt power).

The ICA also suggested that the legislature supplied an alternative procedure for dealing with contemptuous conduct by status offenders in HRS § 571–32(e) (1993), which allows secure detention beyond 24 hours of a minor adjudicated under HRS § 571–11(2) if the minor "is allegedly in or has already been adjudicated for a violation of a valid court order, as provided under the federal Juvenile Justice and Delinquency Prevention Act of 1974, as amended."[4] *See generally In re Baker*, 71 Ill.2d 480, 17 Ill.Dec. 676, 376 N.E.2d 1005, 1006–07 (1978) (recognizing that the legislature may provide an "alternative statutory solution" to the use of the contempt power). "The practical standard [with respect to legislative regulations of court procedures for punishing contempts] is the reasonableness of the legislative regulation. The statutory regulation must preserve to the court sufficient power to protect itself from indignities and to enable it effec-

tively to administer its judicial functions." *In re J.E.S.*, 817 P.2d 508, 512 (Colo.1991) (quoting *State ex rel. Bliss v. Greenwood*, 63 N.M. 156, 315 P.2d 223, 227 (1957)). Here, the ICA extrapolated from HRS § 571–32(e) and the federal statute and its supplementary regulations numerous limitations on the court's contempt authority. *See Doe*, at 351 – 355, 22 P.3d at 998 – 1002. Most significantly, the ICA interpreted the laws stated to preclude the court from securely detaining status offenders for criminal contempt unless it obtains and reviews a written report prepared by "an appropriate public agency (*other than a court* or law enforcement agency)" determining, *inter alia*, that "all dispositions other than secure confinement have been exhausted or are clearly inappropriate." *See id.* at 352 – 354, 354 – 355, 22 P.3d at 999 – 1001, 1001 – 1002 (partial emphasis omitted).

■ Yet, again, HRS § 571–32(e) does not expressly foreclose the family court from adjudicating and punishing a status offender for criminal contempt under HRS § 571–11(1), and we are not inclined to impute such an intent to the legislature without specific indication thereof.[5] The doctrine of "constitutional doubt," a well-settled canon of statutory construction, counsels that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is adopt the latter." *Jones v. United States*, 529 U.S. 848, 857, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909)); *cf. State v. Kane*, 87 Hawai'i 71, 74, 951 P.2d 934, 937 (1998) ("[W]here possible, we will read a penal statute in such a manner to preserve its constitutionality." (Quoting *State v. Gaylord*, 78 Hawai'i 127, 137–38, 890

---

4. The Act conditioned block grants to the states on compliance with numerous requirements, including the deinstitutionalization of status offenders.

5. The legislative history of this provision is similarly inconclusive. In amending HRS § 571–32(e) to its present form, the legislature expressed its intent to "prohibit the incarceration

of children accused or adjudicated of committing *non-criminal offenses* and limits the use of jails and lockup facilities for juveniles accused of a *crime.*" Stand. Comm. Rep. No. 1145, in 1993 House Journal, at 1458 (emphasis added). The history contains no mention of the family court's inherent powers with respect to criminal contempts.

P.2d 1167, 1177–78 (1995).)). In this case, although HRS § 571–48(2)(A) grants the family court discretion to *issue* orders of protective supervision, the reading of HRS § 571–32(e) advanced by the ICA would subject the family court's discretion to *enforce* such orders to the approval of a "public agency" besides the court, ostensibly an arm of the executive branch. Apart from the decisions disallowing criminal adjudication and secure detention of status offenders altogether, an approach which we have already declined to pursue, we can find no precedent for such an external check on the judicial enforcement power. In our view, the interpretation of HRS § 571–32(e) yielding this restriction raises serious constitutional questions relating to the separation of powers doctrine. Insofar as the legislature has not directly spoken on the adjudication of status offenders under HRS § 571–11(1), leaving the statute open to an interpretation allowing such a procedure, we adopt this latter, less restrictive reading in order to avoid the constitutional doubts connected with the former. *Cf. Michael G.*, 243 Cal.Rptr. 224, 747 P.2d at 1159–60 (construing the statute in order to avoid the constitutional question whether the legislature could constitutionally override the court's fundamental contempt power).

Our interpretation, we observe, also stems from sensitivity to the overarching legislative intent to "promote the reconciliation of distressed juveniles with their families, foster the rehabilitation of juveniles in difficulty, render appropriate punishment to offenders, and reduce juvenile delinquency." HRS § 571–1 (1993). "If a juvenile ... can purposely or knowingly disregard Family Court orders without sanction and with impunity ..., the legislation is a nullity, the court has no adequate remedy, [and] the juvenile remains at risk.... Such a result is clearly not in the best interest of the juvenile or the legislative intent." *J.S.*, 629 A.2d at 1374.

In sum, "if family courts are to retain jurisdiction of [status offenders], they must have the authority to handle them. Their inherent contempt powers provide such tools." *In re Darlene C.*, 278 S.C. 664, 301 S.E.2d 136, 138 (1983). We therefore hold that the family court may adjudicate and punish status offenders in violation of a court order of protective supervision under HRS § 571–11(1). At the same time, we do not ignore the general legislative policy of "deinstitutionalizing" status offenders. Accordingly, in line with other courts, we impose several limitations on the family court's contempt powers. First, the minor must receive sufficient notice to comply with the court's order and must understand its terms and operation, in particular, the possibility of secure detention for disobedience. *See, e.g., D.L.D.*, 327 N.W.2d at 689; *Darlene C.*, 301 S.E.2d at 138. Second, the court must consider less restrictive alternatives and determine them ineffective or inappropriate. *See, e.g., Michael G.*, 243 Cal.Rptr. 224, 747 P.2d at 1161.[6] "While the court need not necessarily have attempted lesser penalties before imposing secure confinement, the record should indicate that lesser alternatives were considered by the juvenile court before ordering incarceration." *Id.* at 1162 (citation omitted). Third, contact between the minor and juvenile delinquents convicted of other crimes must "be kept to a minimum." *See, e.g., State ex rel. L.E.A. v. Hammergren*, 294 N.W.2d 705, 708 (Minn.1980). These protective conditions strike the appropriate balance between the competing policies of limiting the secure detention of status offenders and preserving the dignity and authority of the family court.

In the instant case, the ICA held that the family court erred in finding Doe guilty of criminal contempt because Doe did not receive "sufficient notice of the nature of contempt and the consequences thereof." *Doe*, at 347, 22 P.3d at 994. We disagree. The DOE protective supervision rules stated: "IF YOU FAIL TO OBEY THE ABOVE RULES, YOU MAY BE ORDERED TO PERFORM COMMUNITY SERVICE.

---

6. Some courts also limit secure detention to "egregious" violations. *See, e.g., id.; Darlene C.*, 301 S.E.2d at 138. We see little usefulness in requiring the family court to distinguish contempts that are "egregious" from those that are not. The condition that the court consider less restrictive alternatives already ensures the necessary correlation between the violation and punishment.

MAJOR VIOLATIONS MAY RESULT IN DETENTION." (Emphasis in original.) Doe, her mother, and the court officer signed these rules under the statement: "THESE RULES WERE EXPLAINED TO ME AND I UNDERSTAND THEM." (Emphasis in original.) The family court's rules of protective supervision stated: "You are to obey the laws of the City and County of Honolulu, State of Hawaii and U.S. Government. Failure to do so may change your status to that of 'LAW VIOLATOR.'" (Emphasis in original.) Doe, the judge, and Hussey signed the family court's rules under the statement: "THE ABOVE RULES OF MY PROTECTIVE SUPERVISION HAVE BEEN EXPLAINED TO ME. I UNDERSTAND AND ACCEPT THEM." The court officer maintained that she reviewed "each and every rule under the protective supervision rules" with Doe and that Doe acknowledged that she understood them. At the contempt trial, Doe testified that she had understood that if she didn't go to school, then she would be "put into DH."

Doe argued during trial and on appeal that she was not informed what "contempt of court" meant. The relevant question is whether Doe received sufficient notice of the orders and understood their requirements and the prospect of secure detention for noncompliance. A minor need not learn the legal terms and details of punishment for disobeying a court order in order to grasp the concept adequately. Indeed, neither set of rules contained reference to "contempt of court," but simply explained that Doe must follow the rules and that failure to do so might well result in more severe measures, which Doe admitted that she understood to include secure detention. Under these circumstances, we hold that Doe had sufficient notice and understanding of the terms of the orders of protective supervision to be convicted of criminal contempt.

As for the second condition that the court must consider less restrictive alternatives and determine them ineffective or inappropriate, the family court took judicial notice of the files and records in this case, received Doe's psychological report and school progress report into evidence, and considered the testimony of Doe, her mother, and court and school officials. The court then engaged Doe in a lengthy discussion, explaining that she was "taking a step in the right direction," but emphasizing the need for "a consequence for your nonattendance of school" and "a wake-up call." The court evidently determined that prior less restrictive measures had been ineffective and that secure detention was necessary in this case. See G.B., 58 Ill.Dec. 845, 430 N.E.2d at 1,100.

The record contains no information on the conditions of secure detention and separation between Doe and juvenile delinquents convicted of other crimes; in any event, the issue is moot. We emphasize, however, the necessity of such arrangements in order to uphold the legislature's policy of separate treatment of status offenders and juvenile delinquents. See Michael G., 243 Cal.Rptr. 224, 747 P.2d at 1163.

## IV. CONCLUSION

Based on the foregoing, we reverse the decision of the ICA and affirm the family court's findings order and decree of July 1, 1998.