OPINION OF THE COURT
Guy P. DePhillips, J.
On April 21, 1998, petitioner father of the respondent Jennifer G. filed a petition under Family Court Act article 7 seek *693 ing to have her adjudged a person in need of supervision (PINS). Upon respondent’s return on a warrant and joinder of issue, she was remanded to the custody of the Commissioner of Social Services. Respondent continually ran away from the custody of the commissioner in violation of the court’s remand orders over a period commencing April 22, 1998 and ending May 5, 1999, during which an additional nine warrants were issued for her arrest. Family Court Act § 720 (2) provides: “The detention of a child in a secure detention facility shall not be directed under any of the provisions of this article.” Confronted with this statutorily mandated inability to meet the needs of respondent, a chronic runaway who continuously violated the remand orders of the court, an article 3 juvenile delinquency petition was filed on April 30, 1999. The petition alleged an act which if committed by an adult would constitute criminal contempt in the second degree (Penal Law § 215.50 [3]) in that respondent engaged in intentional disobedience to lawful process or other mandate of a court.
On May 5, 1999, upon respondent’s return on the 10th warrant, she was for the first time remanded to a secure detention on the delinquency petition as a preventive detention option available under Family Court Act article 3, but specifically withdrawn by the legislative enactment of Family Court Act § 720 (2) under article 7.
On May 10, 1999, respondent admitted the abscondence in violation of the remand orders, an act which if committed by an adult constitutes the crime of criminal contempt, second degree (Penal Law § 215.50 [3]). On July 2, 1999, at the conclusion of the dispositional hearing respondent was found to require supervision, declared a juvenile delinquent, and placed with OCFS (Office of Children and Family Services) unspecified for 12 months as the least restrictive dispositional alternative. On July 21, 1999, this court issued a decision in both the article 7 PINS proceeding and the article 3 juvenile delinquency proceeding (Matter of Jennifer G., 182 Misc 2d 278 [1999]) explaining the resort to article 3 jurisprudence to meet the needs of and to address the personal safety concerns of the respondent. In that decision the court suggested in strongly worded dicta that Family Court Act § 720 (2) may be unconstitutional. Endeavoring to avoid the constitutional issue while at the same time meeting the needs of respondent, the court suggested that the legislative and executive branches of state government revisit the issue of secure detention. On July 2, 1999, the PINS petition was dismissed as academic without *694 a fact-finding hearing being held in view of the dispositional order issued in the delinquency proceeding.
Since these events, the Legislature did not revisit the issue of secure detention for PINS children. However, of significance, the Legislature amended article 7 of the Family Court Act to increase the subject matter jurisdiction of Family Court from persons less than 16 years of age to persons less than 18 years of age. Family Court Act § 720 was amended in connection with this increased jurisdiction by the addition of a new subdivision (5) which states: “Where the person is sixteen years of age or older, the court shall not order or direct detention under this article, unless the court determines and states in its order that special circumstances exist to warrant such detention.” The legislative absolute prohibition against secure as contrasted with nonsecure detention for a PINS child continues. This expansion of subject matter jurisdiction is effective as of July 1, 2002 (L 2000, ch 596; L 2001, ch 383, part V).
The legislative findings delineated in the enactment setting forth the new effective date of July 1, 2002 read as follows:
“The legislature finds that passage of chapter 596 of the laws of 2000, which raised the maximum age that a person can be declared in need of supervision from 16 years to 18 years, was a recognition that teens under the age of 18 years need supervision, guidance and support to grow and mature into responsible adults. The legislature also finds that raising the person in need of supervision (PINS) age reflected the reality that parents who are in fact legally and financially responsible for their children until they reach the age of 18 years, sometimes need legal and societál support in fulfilling their responsibilities. The legislature further finds that the concerns and conditions which led to the passage of the increase in the PINS age continue to exist and, that the increase in the PINS age is an appropriate response to the needs of children and their families. The legislature also finds however that as we approach the November 1, 2001 effective date of the PINS age increase, there is significant concern regarding the readiness of the state’s child welfare, probation and judicial systems to accommodate the resultant increase in the PINS caseload. In light of the aforementioned concerns and to ensure that upon implementation of the *695 increased PINS age, the systems and services necessary to effectively respond to needs of children and their families are in place and available, the legislature finds that it is necessary and appropriate to grant a delay of the effective date of chapter 596 of the laws of 2000.” (L 2001, ch 383, part V, § 1 [emphasis supplied].)
Fascinatingly, the purpose and justification enunciated by the Legislature in redefining the age of persons in need of supervision which includes runaways is as follows:
“Likewise, a parent of a 16 or 17 year old has the obligation to support that child even if the child has left home and done whatever he or she wishes since a parent is unable to go to the Family Court to have that child determined to be a ‘person in need of supervision’ and have the Family Court help resolve the situation.
“This bill would raise the age over which the Family Court would have jurisdiction to supervise individuals uniformly to 18 for both males and females, ensuring that parents who are legally responsible for the support of their children have available, through Family Court, a means to control that child.” (Senate Mem in Support of L 2000, ch 596, 2000 McKinney’s Session Laws of NY, at 1994 [emphasis supplied].)
Respondent’s placement in the article 3 delinquency proceeding was subsequently extended for a further 12 months on consent on November 15, 2000, effective as of November 4, 2000, pursuant to a supplemental petition filed by OCFS on February 23, 2000. Respondent on September 12, 2001 ran away (AWOL) from the placement facility and was returned on January 31, 2002 to an OCFS facility. On March 25, 2002, OCFS filed a further supplemental petition in the delinquency proceeding seeking to extend respondent’s placement. Since the delinquency determination made on July 2, 1999, both the Appellate Division, Second and First Departments, have held that Family Court lacks the statutory authority to compel compliance with its orders in PINS proceedings through the initiation of delinquency proceedings based on acts which if committed by an adult sound in criminal contempt (Matter of Naquan J., 284 AD2d 1 [2d Dept 2001]; Matter of Jasmine A., 284 AD2d 452 [2d Dept 2001]; Matter of Asia H., 289 AD2d 404 [2d Dept 2001]; Matter of Edwin G., 296 AD2d 7 [1st Dept 2002]). Both appellate departments in so holding conjoined in *696 the following critical observations: “We now add our collective voice to importuning the New York State Legislature to address this widespread problem, and fashion a remedy whereby the Family Court can fairly and effectively deal with the flagrant and repeated violation of its orders by PINS individuals, without abdicating its foundational purpose to provide a parens patriae role to such persons” (Matter of Naquan J., 284 AD2d at 7); “the statutory scheme * * * often renders the PINS proceeding an exercise in futility * * (Matter of Jasmine A., 284 AD2d at 453); “Finally, we [First Department] also join with the Second Department in noting the judicial frustration inherent in these situations, and urge the enactment of corrective legislation” (Matter of Edwin G., 296 AD2d at 12 [emphasis added]). The common sense of these pronouncements of the Appellate Division considered with the observations detailed in Jennifer G. (supra) mandate the conclusion that something is wrong with the statutory framework underpinning PINS jurisprudence. As a state and as a nation we pride ourselves that no person is above the law, not even the president of the republic. The statutory framework of article 7 as presently enacted gives the lie to this pronouncement. What is wrong with the statutory framework is that the PINS respondent, in effect, is above the law and unanswerable to the law for willful violation of appropriate Family Court orders issued in comportment with due process. For example, the runaway is not held accountable by appropriate sanctions for violating the remand orders of the court, whether such violation occurs once, twice, or ad infinitum. Under no circumstances may the PINS respondent be held in any kind of a secure setting even if the very existence of the respondent is at risk under per se statutory article 7 jurisprudence.
Having been educated by the appellate decisions as noted above, and with the consent of the respondent, the court on May 2, 2002 substituted a finding that the respondent is a person in need of supervision for a finding that the respondent is a juvenile delinquent (Family Ct Act § 311.4 [2]). Subsequently on July 12, 2002, with the consent of the respondent and without opposition by OCFS, this court dismissed the instant supplemental petition seeking to extend respondent’s placement in the delinquency proceeding. Concurrently and with respondent’s consent, the court reinstated the prior PINS petition which had been dismissed as academic. In the exercise of discretion and in the interest of justice, the court dismissed *697 the delinquency petition and vacated the finding therein. On July 23, 2002, at fact-finding in the reinstated PINS proceeding the court found respondent to be a person in need of supervision and adjourned the matter for disposition.
“Veritas filia temporis”[1]
The appellate holdings cited above, and respondent’s history of repeated running away while in remand in violation of this court’s orders in the PINS proceeding and her running away while in placement with OCFS under the delinquency docket, mandate that the court confront the issue of the constitutionality of Family Court Act § 720 (2).
The foundational purpose of Family Court to provide a parens patriae role to persons in need of supervision compels resolution of the constitutional propriety of the statutory framework designed by the Legislature to enable such persons “to grow and mature into responsible adults.”
The analysis of the constitutional infirmities of Family Court Act § 720 (2) delineated in dicta in Matter of Jennifer G. (182 Misc 2d 278 [1999]) is now adopted by this court as its ratio decidendi in declaring this statutory enactment unconstitutional.[2]
In supplementing these observations, the court notes the following:
“Historically, a strong interrelationship has existed among delinquency, person in need of supervision, and neglect proceedings. The 1922 Children’s Court Act, for example, defined ‘delinquent child’ as one who committed a crime; who violated a law or municipal ordinance; who was incorrigible, ungovernable or habitually disobedient and beyond the control of his parents; or who was truant. In short, the legal definition of delinquency encompassed conduct which today would form the basis of a PINS petition. [Children’s Court Act of the State of New York § 2; 15 Gilbert-Bliss Civil Practice of New York Annotated (recompiled 1947).] In a similar vein, the Children’s Court Act prescribed almost *698 identical procedures to determine delinquency or neglect petitions. Both causes of action were viewed as related symptoms of family breakdown.
“The 1962 Family Court Act separated non-criminal conduct from delinquency by establishing PINS as a distinct cause of action. The Act also applied an entirely different procedure for neglect cases (originally Article 3, now Article 10). However, the historic interconnection between delinquency, PINS, and neglect actions was preserved, to a limited extent, by permitting the liberal substitution of petitions. In addition to the historic continuity, the ability to substitute petitions maintained the court’s traditional flexibility in framing a suitable disposition. In appropriate cases, the court could select a disposition from any of three dispositional ‘menus’. (See Joint Legislative Committee on Court Reorganization, Family Court Report, 1962 McKinney Sessions Laws, p. 3441.) Therefore, the court was granted the authority to substitute a neglect petition or a person in need of supervision petition for a petition to determine delinquency ‘at any time in the proceedings.’ [Former subsection 716(b).]” (Besharov and Sobie, 1999 Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 311.4, at 139.)
Synoptic analysis of Jennifer G. (supra) follows:
(1) An appropriate dispositional determination whether in a delinquency or person in need of supervision proceeding must reflect the needs and best interests of the respondent. The finding of delinquency and consequent imposition of a dispositional alternative is imposed in article 3 because the respondent is found to be in need of supervision.
(2) Historically the statutory framework for meeting the needs of respondents under delinquency or PINS jurisprudence permits confinement when appropriate under due process (Family Ct Act, as enacted by L 1962, ch 686, eff Sept. 1, 1962; see Children’s Ct Act § 2 [a], as enacted by L 1922, ch 547; see also Matter of Ellery C., 32 NY2d 588 [1973]; Matter of Lavette M., 35 NY2d 136 [1974]).
(3) The Legislature in 1978 and 1987 proscribed preventive secure detention to meet the needs of PINS respondents, but *699 continued such remedial possibility for respondents in a delinquency proceeding.
(4) The runaway respondent in an article 7 proceeding who flouts the valid order of the court, perceiving the inability of the court to enforce its orders because of this legislative proscription, is instructed that the law may be disobeyed without legal consequence as long as the person is charged only with PINS conduct.
(5) Appropriate treatment is inextricably intertwined with adequate supervision. The inability of Family Court to maintain and enforce that supervision through the possibility of remand to a secure PINS facility when warranted for nonpunitive rehabilitative purposes, is a serious jurisprudential and sociological flaw in implementing the public policy concerns envisioned in the creation of Family Court.
(6) The status of the persons brought as respondents before Family Court under articles 3 and 7, their individual needs and absence of clear dividing lines between their needs, the public policy of the State of New York and the subject matter grant of jurisdiction by the Legislature to Family Court to meet those needs, raises another compelling constitutional argument. By removing the court’s power to protect PINS children by remand to secure detention under due process when appropriate, such needy children have been deprived of the equal protection of the laws (Matter of Jennifer G., supra at 286-2S9).[3]
*700 (7) The Legislature in abrogating secure detention for PINS children under article 7, but retaining such possibility for children who may or do require supervision under article 3, did so to obtain federal funds pursuant to 42 USC § 5633, which itself did not require such abrogation for the State to obtain the federal funding. Under the federal mandate, New York could have provided that the detention of a respondent in a secure detention facility under article 7 not be directed unless it is found that the child violated a valid court order.
(8) Family Court is a constitutional court of record and as such is invested with inherent powers which permit the court to do all things reasonably necessary for the administration- of justice within the scope of its subject matter jurisdiction (Gabrelian v Gabrelian, 108 AD2d 445, 448-451 [2d Dept 1985], appeal dismissed 66 NY2d 741 [1985]). The “inherent powers doctrine” implicates that Family Court possesses all powers reasonably required to enable it to perform its judicial functions efficiently, to protect its independence, dignity and integrity, and to make its lawful actions effective. These inherent judicial powers are not derived from legislative grant, but from the fact that the court has been created, the Family Court is, and to be a court of record requires certain incidental powers in the nature of things. Even apart from the codification of the contempt power (see, Judiciary Law art 19), it is recognized that courts have the inherent powers to enforce respect for and compliance with their judgments and mandates by punishment for contempt, which power is not dependent on statute. Courts at English common law were recognized to possess inherent power to punish, by process of contempt, any disregard of judicial authority, both for the benefit of litigants, i.e., civil contempt, and for the preservation of their own order and dignity, i.e., criminal contempt. This power became a part of New York State’s common law which also formed the basis of early state statutes pertaining to contempts.
(9) “A fundamental axiom of our constitutional system is that governmental powers are divided among three branches of government — judicial, executive and legislative. Each branch is separate from and may not inflinge on the independence of the others (20 NY Jur 2d, Constitutional Law, § 151) * * * The State Legislature, having granted Family Court exclusive subject matter jurisdiction over PINS proceedings (Family Ct Act § 115 [a] [v]), cannot deprive Family Court of the power to *701 enforce, implement and effect the policy and goals inherent in that subject matter jurisdiction” (Matter of Jennifer G., 182 Misc 2d at 293-294).
The court now supplements the analysis of the constitutional infirmity of Family Court Act § 720 (2) discussed in Matter of Jennifer G. (182 Misc 2d 278 [1999]) with the following observations: the legislative enactment delineated in Family Court Act § 720 (2) whereby Family Court is specifically instructed that it shall not detain a PINS respondent in a secure setting for any reason also violates the Supremacy Clause of the Federal Constitution. “Since federal law, pursuant to the provisions of the Federal Constitution, is the supreme law of the land, the state legislature, courts, and indeed, all agencies of the state, are barred from taking action that conflicts with valid federal law” (20 NY Jur 2d, Constitutional Law § 101, at 174-175). As noted in Matter of Jennifer G. (182 Misc 2d at 289-290): “It is remarkable that New York in abrogating secure detention for PINS children did so to obtain Federal funds pursuant to 42 USC § 5633, which itself did not demand such abrogation in order for the State to obtain the Federal funding. The Federal enactment provides that in order to receive formula grants under the enactment, a State shall submit a plan for carrying out its purposes which, inter alia, requires the following: ‘(12)(A) provide within three years after submission of the initial plan that juveniles who are charged with or who have committed offenses that would not be criminal if committed by an adult or offenses (other than an offense that constitutes a violation of a valid court order * * *), or alien juveniles in custody, or such nonoffenders as dependent or neglected children, shall not be placed in secure detention facilities or secure correctional facilities’ (42 USC § 5633 [a] [12] [A] [emphasis supplied]).” Clearly the federal enactment recognized and respected the constitutional imperative of the inherent power of a court of record to enforce and implement its valid orders. “When there is a conflict between a statute enacted by Congress pursuant to its delegated powers and a law adopted by the state, the former prevails, though the state law was enacted in that exercise of uncontroverted powers, since giving effect to directions of state law that are contrary to statutes enacted by Congress pursuant to its delegated power would result in the federal statute no longer being the supreme law of the land. The supremacy clause is applicable * * * against state laws *702 that are directly contrary to federal legislation * * (20 NY Jur 2d, Constitutional Law § 103, at 176-177.) Family Court Act § 720 (2) contravenes the federal enactment that permits secure detention for PINS respondents who violate a valid order of the court. In effect the New York Legislature obtained the coveted federal funding under a pretense by ignoring the expressed federal provision allowing for secure detention where a valid court order has been violated and by abrogating the inherent power of Family Court to perform its judicial functions efficiently, to protect its independence, dignity and integrity, and to make its lawful actions effective with respect to article 7. By implication, Family Court Act § 720 (2) also violates the public policy embraced within the federal enactment which reflects genuine concern that the needs of PINS children be met.
An analogous legal proposition regarding the Supremacy Clause was presented to the Court of Appeals in Matter of Rose v Moody (83 NY2d 65 [1993]). In that case, a federal statute (42 USC § 667) mandates an opportunity in all child support cases be afforded the indigent noncustodial parent to rebut and drop the support award floor to $0, when “impoverished circumstances dictate.” Pursuant to this statute, each participating state is required to adopt statewide guidelines in connection with child support awards as a condition for the State’s receipt of federal funds (42 USC §§ 654, 655). The New York Legislature, in adopting the guidelines, created an irrebuttable presumption imposing on an indigent noncustodial parent a $25 per month floor on all child support obligations up to an accumulated debt of $500. The New York Court of Appeals affirmed the Appellate Division which in turn affirmed the order of Family Court, Oswego County, setting the noncustodial parent support obligation at $0. The Court of Appeals noted that New York by accepting the federal funding subjected itself to full compliance with the national regime. “Where a Federal statute facially clashes with a State statute, the Federal statute must triumph” (Matter of Rose v Moody at 67). Similarly, New York by accepting the federal funding pursuant to 42 USC § 5601 et seq. (Juvenile Justice and Delinquency Prevention Act of 1974), subjected itself to full compliance with the national regime which itself directed that PINS respondents shall not be placed in secure detention facilities when charged with offenses other than an offense that constitutes a violation *703 of a valid court order. The absolute proscription against detention of a PINS respondent in a secure detention facility (Family Ct Act § 720 [2]) is directly prohibited under the federal statute because it does not reflect the inherent power of the court to hold the PINS respondent responsible for violation of a valid order of the court and renders the public policy underpinning the federal statute illusory.
“The Family Court Act was enacted by the Legislature to implement article VI of the Constitution” (Matter of Slemons v Slemons, 28 AD2d 634 [3d Dept 1967]). “The new state-wide Family Court was created in 1962 to replace the Domestic Relations Court of the City of New York and the Children’s Courts in the other 57 counties of the State. This was accomplished as part of the general reorganization of our courts and the establishment of a unified court system through amendment of the New York State Constitution (art. VI), effective September 1, 1962.” (People v Johnson, 20 NY2d 220, 222 [1967] [Fuld, Ch. J.].) To paraphrase Judge Levine in Matter of Raymond G. (93 NY2d 531, 534 [1999]): “Now and since its inception, Family Court has possessed ‘exclusive original jurisdiction over any proceeding [involving a person alleged to be in need of supervision]’ (* * * Family Ct Act former § 713 * * *; see also NY Const, art VI, § 13 [b]; Family Ct Act § 115 [a] [vi]).”
Most instructive is the rational of our sister state Hawaii’s highest appellate court set forth in In re Doe (96 Haw 73, 26 P3d 562 [2001]). In that case both Hawaii’s Supreme Court and Intermediate Court of Appeals (95 Haw 340, 22 P3d 987 [1999]) recognized that status offenders (PINS) may be temporarily confined in secure facilities for violations of “valid court orders” as defined under the Federal Juvenile Justice and Delinquency Prevention Act of 1974. Under review was the July 1, 1998 findings, order, and decree of the Family Court finding respondent-appellant Jane Doe in criminal contempt for violating an order of protective supervision issued by the Family Court. The Supreme Court
“recognized the bedrock principle “[t]hat the power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts and consequently to the administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became pos *704 sessed of their power. Likewise, the constitutional courts of Hawaii possess the inherent power of contempt.
“Although the power to punish for contempt is an inherent power of the courts, the legislature may establish alternative procedures and penalties that do not unduly restrict or abrogate the courts’ contempt powers. See Young, 481 U.S. at 799, 107 S.Ct. 2124, 95 L.Ed.2d 740; Walker v. Bentley, 678 So.2d 1265, 1267 (Fla.1996) (holding that ‘[a]ny legislative enactment that purports to do away with the inherent power of contempt directly affects a separate and distinct function of the judicial branch, and, as such, violates the separation of powers doctrine * * * of the Florida Constitution) * * *.’ LeMay v Leandes, 92 Hawaii 614, 620-21, 94 P.2d 546, 552-53 (2000)” (In re Doe, 96 Haw at 79-80, 26 P3d at 568-569 [citations omitted and emphasis added]).
The Hawaii Supreme Court further acknowledged that the specific criminal contempt statute and the general statutes of that state declaring the power of the courts, provide statutory authority for punishing contempts, but that such statutory authority is merely legislative restatements of the courts’ existing powerlll Recognizing that the legislative branch of government may not abrogate the inherent contempt power of the courts, Hawaii’s Supreme Court noted that the legislature may regulate its use. In engaging in such regulation, the reasonableness of the regulation is subject to judicial review in that “ ‘[t]he statutory regulation must preserve to the court sufficient power to protect itself from indignities and to enable it effectively to administer its judicial functions’. In re J.E.S., 817 P.2d 508, 512 (Colo. 1991) (quoting State ex rel. Bliss v. Greenwood, 63 N.M. 156, 315 P.2d 223, 227 (1957).” (In re Doe, 96 Haw at 81, 26 P3d at 570 [emphasis supplied].)
While the Hawaii Supreme Court refused to impute an intent to their legislature to foreclose Family Court from adjudicating and punishing a status offender (PINS) for criminal contempt because their statute (Haw Revised Stat Ann § 571-32 [e]) does not expressly foreclose this possibility, the New York statute, Family Court Act § 720 (2), has been held by both the Appellate Divisions, Second and First Departments, to specifically so proscribe and to thereby strip Family Court of the State of *705 New York, a constitutional court, of its inherent power of contempt (Matter of Naquan, J., supra; Matter of Jasmine A., supra; Matter of Asia H., supra; Matter of Edwin G., supra). New York’s statute, therefore, is clearly not susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided. This court’s duty on behalf of Family Court as a constitutional court and on behalf of PINS children and their families is to confront those grave and doubtful constitutional questions.
“ Tf a juvenile * * * can purposely or knowingly disregard Family Court orders without sanction and with impunity * * *, the legislation is a nullity, the court has no adequate remedy, [and] the juvenile remains at risk * * * Such a result is clearly not in the best interest of the juvenile or the legislative intent.’ J.S., 629 A.2d at 1374” (In re Doe, 96 Haw at 82, 26 P3d at 571).

“What would prompt any legislator, any judge, any officer of the court, any government official to endorse this mockery of justice and to allow the PINS juvenile to remain at risk?”

[4]

Hawaii’s Supreme Court concluded: “In sum, ‘if family courts are to retain jurisdiction of [status offenders], they must have the authority to handle them. Their inherent contempt powers provide such tools’. In re Darlene C., 278 S.C.664, 301 S.E.2d 136, 138 (1983)” (In re Doe, 96 Haw at 82, 26 P3d at 571).
It is this court’s view that running away as an occasion for jurisdiction cannot be equated legally or factually with running away in willful and contumacious defiance of a valid court order (see In re Doe, 96 Haw at 80, 26 P3d at 569).
“Dismay is the only reasoned response when one studies the legislative history of [Family Court Act at § 720 (2)] * * *
“Ultimately the ability to mandate treatment services for the child and compliance by the child with such services under articles 3 and 7 reposes in the power of Family Court. The exercise of that power is not beyond review, but is subject to oversight and criticism when warranted. To eviscerate that power is to reduce article 7 to a remedy without *706 substance, a hollow form and a false hope. If the State Legislature were to remove secure detention as a possible exercise of power by the Family Court where appropriate and warranted in an article 3 (delinquency proceeding), the protests would be deafening. That they have done so in article 7 amidst a roaring silence is ample testimony that the ideals envisioned in the creation of Family Court are far from being realized.” (Matter of Jennifer G., 182 Misc 2d at 296-297.)
Neither Lady Justice nor Jennifer G. are to be mocked or neglected.[5]
Because of this, because conscience wills it so, because Fam *707 ily Court is a constitutional court, because of the public policy embraced in article 7, because of its oath of office and because of the dignity of Jennifer G. and in common humanity, this court declares Family Court Act § 720 (2) unconstitutional.[6]

. “Truth is the daughter of Time”

. On June 5, 2002, notice to the Attorney General of the State of New York to intervene concerning the constitutionality of Family Court Act § 720 (2) was sent by respondent’s law guardian pursuant to court direction.

. “Respondents in article 7 are educated or will inevitably be educated in the ‘School of the Streets’ that absconding from nonsecure detention carries no penalty, no consequence, unless in rebelling against authority by endeavoring to or succeeding in absconding, they commit an act or acts which if committed by an adult constitute a crime. The absence of the power to remand to secure detention in PINS litigation to meet the needs and the best interests of and to protect the respondent is a cancer that enfeebles the public policy envisioned by the creation of Family Court. In many instances, parents have already exhausted all reasonable means to secure compliance with appropriate household rules and regulation by their absconding child. They come to Family Court as a last resort. Remand to the Commissioner of Social Services merely substitutes an agency and its employees for the parent. Unless there is an expectation that parental authority may be enforced and reenforced, the PINS child will ignore or treat that authority with contempt. The PINS child as well as the delinquent child is entitled to the equal protection of the laws. To deprive Family Court of the power to advance the welfare of the PINS child while maintaining such power in the court to advance the good of the delinquent child, and to do so for monetary consideration alone, is to arbitrarily discriminate without just cause and right reason.” (Matter of Jennifer G., 182 Misc 2d at 289.)

. See instructive dialogue in “Letters To The Editor” by counsel at the Legal Aid Society’s Juvenile Rights Division (NYLJ, Aug. 26, 1999, at 2, col 6) and response (NYLJ, Sept. 3, 1999, at 2, col 6).

. “With the passage of the original Family Court Act in 1962, New York became one of the first states to establish a separate category of jurisdiction for status offenders. Under the predecessor Children’s Court Act (§ 2) and Domestic Relations Court Act (§ 2), the court’s entire jurisdiction over juvenile misbehavior, including violations of law, habitual truancy, ungovernability, and incorrigibility, was subsumed under the term ‘juvenile delinquent.’ However, in 1962, the Joint Legislative Committee on Court Reorganization, which drafted the Family Court Act, found that the term ‘juvenile delinquent’ had become ‘a term of disapproval.’ (Joint Legislative Committee on Court Reorganization, ‘The Family Court Act,’ Vol. 2, 1962 McKinney’s Session Laws of NY at 3428, 3434.) The term had grown to mean ‘juvenile criminal.’ To avoid ‘the needless stigma’ (Id. at 3434) of the term, ‘juvenile delinquent,’ the Committee developed the concept of a ‘person in need of supervision’ to cover noncriminal, status offenses.
“Ironically, the term ‘person in need of supervision’ and its impersonal acronym, ‘PINS,’ which was intended to avoid the stigma of the term ‘juvenile delinquent’ which was in turn intended to avoid the stigma of criminal court terminology, has itself become a term of disrepute and opprobrium, underscoring the apparent unavoidability of stigmatization whenever a label is applied to individuals. [See generally Office of Children’s Services, N.Y. Judicial Conference, Juvenile Injustice (1973).]
“The truth of the matter is that there are no clear dividing lines between delinquent and PINS children. Their truancy rates are equally and extremely high. (Juvenile Injustice, supra, at 17.) PINS children frequently commit criminal acts which either do or do not come to the attention of the authorities. They both often have a long history of contacts with the court and social agencies. According to one study, nearly half of them have experimented with drugs. [Office of Children’s Services, N.Y.S. Judicial Conference, The PINS Child: A Plethora of Problems 75 (1973).] Both delinquent and PINS children often come from similar, one parent, multi-problem families with a history of poverty and strong evidence of neglectful or at least rejecting parents. (Juvenile Injustice, supra, at 23-25.) In fact, juvenile justice professionals see some 14-18 categories of PINS children as more disturbed and more difficult to treat than all but the most severe delinquents.” (Besharov, Introductory Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act art 7, at 4-5.)

. It is noted that respondent is currently placed with the Commissioner of Social Services and the permanency planning goal is discharge to independent living. While respondent’s propensity to run away is of real continuing concern, this court has not invoked its inherent contempt power and has endeavored to have respondent’s best interests and needs met by securing the assistance of CASA (Court Appointed Special Advocate) and requiring the Commissioner to adequately address those needs. Respondent’s wilfulness is both an asset and liability, dependent on the degree of maturity and immaturity attendant upon the exercise of that will. Respondent is needy. In her allowing her needs to be met and in the State’s effort to meet those needs resides the denouement of this article 7 proceeding. To paraphrase the words of a loving parent, is it not better to protect and adequately supervise a child in need of love and care than to endeavor to repair a broken adult. If temporary secure detention is requisite to serve this goal with full due process and review, this is recognition of the child’s humanity and not an abstraction of the child’s existence.